**Ralph D. ARMSTRONG,**
**Plaintiff–Appellee,**

v.

**Karen D. DAILY, et al., Defendants–**
**Appellants.**

Nos. 13–3424, 13–3482.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 9, 2014.

Decided May 11, 2015.

Russell R. Ainsworth, Gayle Horn, Jon C. Loevy, Loevy & Loevy, Chicago, IL, for Plaintiff–Appellee.

John J. Glinski, Office of the Attorney General Wisconsin Department of Justice, Madison, WI, for Defendants–Appellants.

Before FLAUM, ROVNER, and HAMILTON, Circuit Judges.

HAMILTON, Circuit Judge.

Ralph Armstrong was imprisoned for 29 years for the rape and murder of Charise Kamps—a crime that he maintains he did not commit. His conviction was set aside in 2005, and in 2009 a Wisconsin state judge dismissed the charges entirely because the prosecution had destroyed key exculpatory evidence, rendering a fair trial impossible. Armstrong then brought this civil suit under 42 U.S.C. § 1983 seeking damages from the prosecutor and state crime laboratory technicians who he alleges deprived him of his liberty without due process of law by destroying exculpatory evidence to frame him for Kamps' murder. Defendants appeal from the denial of their motions to dismiss this case under Federal Rule of Civil Procedure 12(b)(6) on grounds of qualified immunity. In this posture, we have only the complaint before

us and therefore must treat Armstrong's allegations as true.

Armstrong alleges a shocking course of prosecutorial misconduct. According to the complaint, the prosecutor quickly fixated on Armstrong as the murderer and sought to build a case against him by any means necessary. Those means included destroying potentially exculpatory evidence from the crime scene, arranging for the highly suggestive hypnosis of an eyewitness, contriving suggestive show-ups for identification, and concealing a later confession from the true killer that was relayed by a person with no apparent motive to fabricate the report. Finally, the prosecutor enlisted state lab technicians to perform an inconclusive DNA test that consumed the last of a sample that could have proven Armstrong's innocence and pointed to the true killer. If these allegations are true—and some are based on the state court's factual findings—the prosecution of Armstrong was a single-minded pursuit of an innocent man that let the real killer go free.

A full explanation of these events will require fact-finding in the district court. For now, only two claims are before us. First, Armstrong claims that prosecutor John Norsetter acted in bad faith by allowing the loss or destruction of drug paraphernalia found at the crime scene—evidence that would exculpate Armstrong and implicate the real killer. This evidence was allegedly tossed in a plastic trash bag, placed in an office storage locker, and lost before Armstrong's trial in 1981.

Second, Armstrong claims that after the Wisconsin Supreme Court vacated his conviction and ordered a new trial in 2005, two state lab technicians, Karen Daily and Daniel Campbell, deliberately violated a state court order to preserve evidence by destroying an exculpatory DNA sample in 2006. At the request or order of Norsetter, but without notice to the court or the defense, Daily and Campbell performed an inconclusive test that consumed all of a DNA sample extracted from a newly discovered semen stain on the victim's bathrobe belt. This test could not distinguish between Armstrong and his late brother, who Armstrong claims was the true killer. (Armstrong's brother had allegedly confessed to an acquaintance, who in turn told prosecutor Norsetter in 1995.) The destruction of the DNA sample prevented Armstrong from performing other tests that could have distinguished between him and his brother. Armstrong spent three more years in prison before a state court finally dismissed the charges because of the destruction of the DNA sample.

We affirm the district court's decision to allow both claims to proceed. First, plaintiff's federal due process claims against all defendants based on the destruction or loss of exculpatory evidence are not barred by the availability of state tort remedies for the same wrongs. The doctrine of *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), does not apply to the actions of law enforcement officers that undermine the fairness of a criminal trial. Second, at the time of the original investigation, it was clearly established under *Killian v. United States*, 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961), and then *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that bad-faith destruction or loss of exculpatory evidence would violate a suspect's due process rights. *Brady* made clear that the police and prosecution could not *suppress* exculpatory evidence. A reasonable police officer or prosecutor would not have concluded that he could instead *destroy* evidence to avoid disclosing it to the defense. Third, if plaintiff can show that the unconstitutional destruction of exculpatory evidence in 2006 caused him to suffer a deprivation of liberty, he can sue for that injury without having gone through a second trial.

Finally, while there is some disagreement among courts about the conditions for obtaining a civil remedy for destruction of exculpatory evidence, those disagreements do not support a qualified immunity defense. It was clearly established in 2006 that the defendants' alleged *conduct* of destroying the evidence would violate defendant's due process rights. That is sufficient to defeat the qualified immunity defense.

## I. *Factual and Procedural Background*

Because we are reviewing a decision on a motion to dismiss under Rule 12(b)(6), we accept the allegations of the complaint as true and draw from those allegations all reasonable inferences in favor of the plaintiff. *Parish v. City of Elkhart,* 614 F.3d 677, 679 (7th Cir.2010); *Parish v. City of Chicago,* 594 F.3d 551, 552 (7th Cir.2009). Whether Armstrong can prove his allegations is not the issue now before us. We must proceed on the premise that the defendants acted as Armstrong has alleged and did so in bad faith.

### A. *The Crime Scene and Initial Investigation*

Charise Kamps was raped and murdered in her home in Madison, Wisconsin, on June 24, 1980. Defendant John Norsetter, then an assistant district attorney for Dane County, arrived on the scene shortly after her body was discovered. Norsetter advised and directed Madison police officers on all aspects of the investigation, including collecting and retaining evidence. The officers discovered two items of physical evidence at the center of Armstrong's claims: a bathrobe belt used as the murder weapon and drug paraphernalia that could have shown who had been in Kamps' apartment the evening she was murdered.

The officers found the bathrobe belt draped over Kamps, who was lying on her bed. The belt was not forensically analyzed in the initial investigation in 1980. However, semen stains on the accompanying bathrobe were tested. Results showed that the stains came from the same secretor type as Armstrong, though Kamps' boyfriend and 80 percent of the population also fit that profile. More precise DNA analysis was not available for the initial investigation in 1980.

The officers also found drug paraphernalia—a small mirror, razor blade, and silver straw, all used to snort powder cocaine—lying on the kitchen table, suggesting recent use. The officers and Norsetter knew that this evidence could show who was in Kamps' home the night of her death. By interviewing witnesses, including Armstrong, the police had learned that Kamps had tried to buy cocaine on the night of her murder. A person who used cocaine with Kamps that night would have been an obvious suspect in the murder. Witnesses accused Armstrong of selling cocaine to Kamps and using it with her that night, but Armstrong denied it. The drug paraphernalia evidence also could have corroborated Armstrong's claim that he had not provided cocaine to or used cocaine with Kamps that night. But the drug paraphernalia was never examined for fingerprints or subjected to any other forensic testing. Instead, it was tossed into a large plastic trash bag and left in an office storage locker at the police station, only to be lost.

The police also canvassed the neighborhood and found a witness, Riccie Orebia, who saw a man suspiciously entering and leaving Kamps' apartment building the night of the murder. Orebia described that person as roughly 5′6″ tall and weighing 165 pounds. The man she saw was also shirtless with no tattoos and had a

mustache. Armstrong is 6'2" tall and weighed at least 200 pounds. He had dark, noticeable tattoos on his upper arms, and no mustache.[1]

Norsetter and the police had Orebia hypnotized. During the hypnosis sessions, Armstrong alleges, Orebia was "allowed to view" photographs of Armstrong and his car. After the hypnosis, the police arranged a series of show-ups with several different men, including Armstrong. All the men were put through a reenactment near the scene of the crime to assist Orebia in identifying the man she saw the night of the murder. Orebia selected Armstrong. The full details of the show-ups, which Orebia later described as rigged, are recounted in *Armstrong v. Young*, 34 F.3d 421 (7th Cir.1994), in which this court affirmed the denial of federal habeas corpus relief to Armstrong because, among other issues, the totality of circumstances indicated that Orebia's identification was sufficiently reliable that its admission as evidence was permissible.

Testimony from a hearing inquiring into the prosecution's conduct in this case sheds further light on the initial investigation. The complaint alleges that in that hearing, Norsetter testified that his attitude and approach to the Kamps investigation were that no matter what exculpatory evidence might emerge, he would continue to believe that Armstrong committed the crime and would act accordingly.

### B. *Armstrong's Conviction and Subsequent Challenges*

A jury convicted Armstrong of first-degree murder and first-degree sexual assault in 1981. He was sentenced by the trial court to life plus 16 years in prison.

Armstrong sought post-conviction relief on two principal grounds. Immediately after his conviction, he argued to state and federal courts that the hypnosis and rigged show-ups were unduly suggestive and violated his due process rights. As noted, that issue was conclusively resolved against Armstrong by this court in 1994. *Armstrong v. Young*, 34 F.3d 421, 430–31 (7th Cir.1994).

Armstrong later pursued another avenue for post-conviction relief, arguing for a new trial because of newly discovered evidence. The State had argued in the trial that the physical evidence showed "conclusively and irrefutably" that Armstrong was the murderer. *State v. Armstrong*, 283 Wis.2d 639, 700 N.W.2d 98, 101 (2005). Armstrong then presented the results of newly available DNA testing that excluded him as a possible source of the semen stains on the victim's bathrobe. The State, despite its arguments at trial, responded by minimizing the importance of the physical evidence. The state trial court ruled against Armstrong because he failed to prove that a different result would be reached in a new trial with the new evidence. The Wisconsin Court of Appeals affirmed in an unpublished order. *State v. Armstrong*, No. 92–0232–CR, 504 N.W.2d 873 (Wis.App. June 17, 1993) (Table).

Years later, Armstrong renewed his request for a new trial in another petition to the state courts. He presented the results of additional DNA testing. The results definitively excluded him as the possible source of hair on the victim's bathrobe belt, which the State had asserted at trial belonged to Armstrong. Armstrong also offered an expert's analysis that swabs and scrapings taken from Armstrong's nails

---

**1.** Orebia, described as a "male transvestite," was referred to as a woman by a prior decision of this court, *Armstrong v. Young*, 34 F.3d 421, 423 n. 1 (7th Cir.1994), and throughout Armstrong's criminal trial, *State v. Armstrong*, 110 Wis.2d 555, 329 N.W.2d 386, 389 n. 3 (1983). We use female pronouns for consistency.

and cuticles the day of the murder contained no blood at all, contrary to the State's argument at trial that the victim's blood had been detected. Finally, Armstrong pointed out that DNA analysis excluded him as the source of semen on Kamps' bathrobe, which the State had linked to Armstrong at trial through the crude test of secretor types.

The state trial and appellate courts again denied relief, but the Supreme Court of Wisconsin reversed. It held that the real controversy of identification was not fully tried because the jury never considered the newly discovered exculpatory evidence and heard instead that the physical evidence showed conclusively that Armstrong was guilty.. *State v. Armstrong,* 700 N.W.2d at 128–29. The court vacated Armstrong's conviction and ordered a new trial. In the meantime, however, Armstrong stayed in prison.

## C. *Handling the Evidence on Remand*

Armstrong was never retried. In 2009, after he had served 29 years in prison for Kamps' murder, the state trial court dismissed the charges because the State had acted in bad faith in destroying critical physical evidence.

The contested physical evidence was governed by two court orders. A court order issued in December 2005—after the state lost the appeal in the state supreme court—required the prosecution to inform the defense of future tests and to allow the defense to be present for any handling of the evidence. Also, a court order from as far back as March 2000 required that the results of any testing be forwarded to the defense.

In 2006, after the remand, Armstrong discovered that the prosecution had violated both court orders by destroying key exculpatory evidence: a newly discovered semen stain on the victim's bathrobe belt,

which was the murder weapon. The man who was the source of the semen stain would be an obvious suspect. Armstrong alleges that this evidence was "the most critical and probative physical evidence remaining in the case." The prosecution knew the semen stain on the belt could be exculpatory. State lab technician Karen Daily wrote in a report dated April 10, 2006 that Armstrong was "eliminated as the source" for all DNA samples she had tested, including the semen stains on the bathrobe and the belt.

Despite these exculpatory results, the prosecution announced a month later that it would retry Armstrong. Just a few weeks after the announcement, prosecutor Norsetter ordered further testing of the bathrobe belt during a call with Daily. The .testing was plainly aimed at finding inculpatory evidence to resuscitate the prosecution's case. Armstrong's attorneys had announced that they intended to test the newly discovered semen stains to identify the true killer. Armstrong's attorneys were neither provided notice of the State's testing before it was done nor given the results afterward. That violated both court orders governing access to the physical evidence.

Daily and defendant Daniel Campbell, another state lab technician, performed a test that consumed the entire DNA sample but provided only inconclusive results that could not confirm or eliminate Armstrong as a possible source of the stain. This test, a "single tandem repeat" on the Y chromosome, or Y–STR, looks only at the Y chromosome and therefore cannot distinguish between men with the same father. The Y–STR test matched Armstrong's DNA to the DNA extracted from the semen stain on the bathrobe belt.

This result was dangerously misleading because Ralph Armstrong's brother, Ste-

phen Armstrong, who died in 2005, may well have been the true killer. In 1995, an acquaintance of Stephen Armstrong called Norsetter to report that Stephen had confessed to her that he had killed Kamps. The acquaintance had no apparent motive to fabricate Stephen's confession. If Stephen Armstrong was the source of the newly discovered semen, then a Y–STR test of the semen stain would show a match with plaintiff Ralph Armstrong's Y chromosome, though a more discriminating test could have differentiated between the brothers and therefore exculpated Ralph. Norsetter never disclosed the call relating Stephen's confession to Ralph Armstrong or his attorneys, nor, apparently, did he tell the state lab technicians that Stephen might be a suspect.

The Y–STR test consumed the entire sample, which was contaminated in the process. As a result, Armstrong alleges, he is unable to prove conclusively that he was not the source of the semen, nor can he conduct further testing to attempt to identify the true killer.

After Armstrong's attorneys discovered that the prosecution's secret testing had destroyed the evidence, they moved to dismiss the charges against Armstrong in December 2006. The state court held an evidentiary hearing in 2009. When Norsetter was asked about the failure to inform the defense of the planned testing, he said that he "just forgot" about the December 2005 court order governing the evidence.

The state court found that the stain on the bathrobe belt had both potential and apparent exculpatory value and that the prosecution had destroyed that evidence in bad faith. The court dismissed the charges against Armstrong because the destruction of that evidence had irreparably compromised his right to a fair trial. Armstrong had remained in prison for the three years between the destruction of the evidence in 2006 and the court's dismissal in 2009.

### D. *This Federal Civil Case*

In 2012, Armstrong filed this civil suit for damages under 42 U.S.C. § 1983, which provides a federal remedy for state and local officials' violations of federal constitutional rights. His pro se second amended complaint—the one before us— asserts four claims: (1) prosecutor Norsetter and unnamed police officers acted in bad faith to destroy potentially exculpatory evidence, the drug paraphernalia found in Kamps' apartment; (2) Norsetter and other state defendants violated Armstrong's due process rights by introducing the testimony of Orebia, which was tainted by the unduly suggestive hypnosis session and rigged show-ups; (3) Norsetter, Daily, and Campbell violated Armstrong's due process rights by mishandling physical evidence in the court's custody and consuming the semen sample on the bathrobe belt; (4) Norsetter and another state defendant suppressed evidence of a confession by Stephen Armstrong, the true killer, that was relayed to Norsetter.

The district court dismissed the second and fourth claims at screening. See 28 U.S.C. § 1915A(b). The court found the second claim was barred by res judicata; state and federal courts had previously adjudicated that claim and found no due process violation. The fourth claim was barred by absolute immunity because Norsetter was acting as a prosecutor in 1995 in dealing with the evidence of Stephen Armstrong's confession relayed by the acquaintance. The district court found, however, that Armstrong could proceed on the first and third claims: that Norsetter destroyed the drug paraphernalia evidence (when acting as an investigator rather than as a prosecutor) and that Norsetter,

Daily, Campbell, and other state defendants destroyed the bathrobe belt semen evidence. The district court also granted Armstrong's request to recruit counsel for him. Since then he has been represented by counsel.

Norsetter, Daily, and Campbell then filed motions to dismiss these remaining claims. Norsetter moved to dismiss the first claim, for destroying the drug paraphernalia evidence, claiming both qualified immunity and absolute prosecutorial immunity. Norsetter, Daily, and Campbell moved to dismiss the third claim of destroying the bathrobe belt semen stain evidence. Daily and Campbell claimed qualified immunity, and Norsetter claimed both qualified immunity and absolute prosecutorial immunity. Armstrong opposed these motions and also sought leave to amend his complaint to add a claim for federal malicious prosecution.

The district court denied Norsetter's motion to dismiss the first claim because, looking only at the allegations of the complaint, it was not clear that he enjoyed qualified immunity for his actions. Norsetter is entitled to absolute immunity for his actions as a prosecutor but not for his actions as an investigator. The court granted the motion to dismiss Norsetter from the third claim. His acts and omissions in assisting the State to prepare for retrial in 2006 were "intimately related to the judicial phase of the criminal process," *Fields v. Wharrie*, 672 F.3d 505, 513 (7th Cir.2012), so he is entitled to absolute immunity. Daily and Campbell were not dismissed from the third claim based on their involvement in the destruction of the bathrobe belt semen stain. Finally, the district court denied Armstrong leave to amend his complaint because the new allegations were too vague to state claims upon which relief could be granted. Norsetter, Daily, and Campbell took these interlocutory appeals from the district court's denial of their motions to dismiss these two claims for qualified immunity.

## II. *Analysis*

### A. *The Scope of Appellate Jurisdiction*

■ An appeal from a denial of an official defendant's motion to dismiss or for summary judgment based on the defense of qualified immunity is permitted as an appeal from a collateral order because qualified immunity is "*immunity from suit* rather than a mere defense to liability," and is "effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); see also *Behrens v. Pelletier*, 516 U.S. 299, 307, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (relying on *Mitchell* to hold that "an order rejecting the defense of qualified immunity at *either* the dismissal stage *or* the summary judgment stage is a 'final' judgment subject to immediate appeal"). The appeal is limited in scope for the same reason it is permitted: the question of qualified immunity is "conceptually distinct from the merits of the plaintiff's claim that his rights have been violated." *Mitchell*, 472 U.S. at 527–28, 105 S.Ct. 2806. In this posture, we "need not consider the correctness of the plaintiff's version of the facts." *Id.* at 528, 105 S.Ct. 2806. The qualified immunity defense requires us to consider only two limited questions at this stage: first, whether plaintiff has alleged a violation of his constitutional rights, and second, whether the violation was clearly established in the law at the time of the defendant's conduct. *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

■ We must decline plaintiff Armstrong's invitation to review the separate issue posed by the district court's denial of leave to amend the complaint to add a

federal constitutional claim for malicious prosecution. Whatever the merits of the argument, we lack jurisdiction to consider it in these appeals for several reasons. First, it was not the subject of an appealable order. Second, Armstrong did not file a cross-appeal, which is necessary if an appellee seeks to modify a judgment in his favor. E.g., *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 479, 119 S.Ct. 1430, 143 L.Ed.2d 635 (1999). Finally, this is not the sort of closely related issue that warrants the exercise of pendent appellate jurisdiction—"a narrow doctrine that allows an appellate court 'to review an otherwise unappealable interlocutory order if it is inextricably intertwined with an appealable one.'" *Abelesz v. OTP Bank*, 692 F.3d 638, 647 (7th Cir.2012), quoting *Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 977 (7th Cir.2010); see generally *Swint v. Chambers County Comm'n*, 514 U.S. 35, 43–51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995) (restricting pendent appellate jurisdiction). For now, we have jurisdiction over only the questions of law presented by the district court's denial of qualified immunity to the state defendants on the first and third claims.

### B. *Legal Standard for Qualified Immunity*

■ We review *de novo* the district court's denial of the motion to dismiss for qualified immunity. *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir.2001). Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson*, 555 U.S. at 231, 129 S.Ct. 808, quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

For qualified immunity, the appropriate focus is "on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." *Harlow*, 457 U.S. at 819, 102 S.Ct. 2727. *Harlow* "purged qualified immunity doctrine of its subjective components," meaning that the defendants' actual state of mind or knowledge of the law is irrelevant to whether the asserted conduct would have been legally reasonable. *Mitchell*, 472 U.S. at 517, 105 S.Ct. 2806; see also *Crawford–El v. Britton*, 523 U.S. 574, 598, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (rejecting heightened standard of proof for constitutional claims involving improper motive and directing district courts to "determine whether, assuming the truth of the plaintiff's allegations, the official's conduct violated clearly established law").

■ To determine if the defendants are entitled to qualified immunity, we ask two questions: (1) whether "the facts alleged show the officer's conduct violated a constitutional right," and (2) whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *modified on other grounds by Pearson*, 555 U.S. at 236, 129 S.Ct. 808 (allowing courts discretion to conduct two-step inquiry in sequence better suited to particular case); accord, *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012). With this standard in mind, we turn to defendants' arguments.

### C. *The Parratt Defense Based on State Tort Remedies*

Armstrong alleges that all three defendants deprived him of his liberty without

due process of law by acting in bad faith to cause the loss or destruction of exculpatory evidence. All three defendants argue that Armstrong has failed to allege a violation of his federal constitutional rights. They argue that a state tort action could have provided him a remedy sufficient to satisfy federal due process requirements. The argument is based on *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). That case held that state officials did not violate a prisoner's procedural due process rights by negligently losing his personal property because their actions could be remedied through a state tort suit—all the process constitutionally due for the officials' "random and unauthorized" acts. 451 U.S. at 541, 543–44, 101 S.Ct. 1908.[2]

*Hudson v. Palmer* extended this reasoning to intentional deprivations of property. 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). And in *Zinermon v. Burch,* the Court concluded that the *Parratt/Hudson* rationale also extends to "random and unauthorized" deprivations of liberty. 494 U.S. 113, 132, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). As defendants read these cases and frame the question, Armstrong has alleged wrongdoing by defendants that (a) would have been "random and unauthorized" and (b) could have been the subject of a tort claim under Wisconsin law, so any deprivation of liberty would not have been without due process of law.

■ We reject this argument, which we view as profoundly mistaken. The defendants read the *Parratt* doctrine much too broadly. First, the *Parratt* doctrine does not apply to claims alleging that wrongful conduct corrupted fair fact-finding in the criminal justice system. No court has sug-

gested as much. Armstrong's claims seek to vindicate rights of fundamental fairness and thus differ in kind from procedural due process claims governed by *Parratt,* which seek only notice and a hearing before a deprivation occurs. Second, the defendants' broad reading of *Parratt* cannot stand in light of later limiting cases. Those cases have made clear that *Parratt* is limited to a narrow category of due process cases where the plaintiff claims he was denied a meaningful pre-deprivation hearing, but under circumstances where the very notion of a pre-deprivation hearing would be impractical and even nonsensical, and where the deprivation was not carried out through established state procedures. See, e.g., *Zinermon,* 494 U.S. at 128, 138, 110 S.Ct. 975. The fact that the alleged wrongdoing also violated state law and could support a tort claim is not sufficient to invoke the *Parratt* doctrine. Third, when the *Parratt* doctrine is understood properly, the differences between those cases and this one become clear and decisive.

### 1. *Parratt and Violations of Fundamental Fairness in Criminal Proceedings*

The defendants argue that Armstrong's claims based on the loss or destruction of exculpatory evidence are procedural due process claims, and procedural due process claims are governed by *Parratt.* See *Zinermon,* 494 U.S. at 125, 110 S.Ct. 975 (holding that the existence of state remedies is relevant to procedural due process claims but not claims based on substantive due process or other specific protections in the Bill of Rights). But no court has applied *Parratt* to claims that the govern-

---

**2.** On grounds not relevant here, *Parratt* was overruled in part by *Daniels v. Williams,* 474 U.S. 327, 330–331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), which held that purely negligent conduct could not deprive an individual of life, liberty, or property in violation of the Fourteenth Amendment.

ment violated a defendant's right of access to exculpatory evidence. Armstrong's claims do not seek notice and a hearing—like the procedural due process claims addressed in *Parratt* and its progeny—but rather seek to vindicate rights of fundamental fairness in criminal proceedings.

We find support for this distinction in Justice Kennedy's concurring opinion in *Albright v. Oliver*, 510 U.S. 266, 281–86, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), which we have treated as controlling. See *Newsome v. McCabe*, 256 F.3d 747, 750–51 (7th Cir.2001). The claim in *Albright* was only that the plaintiff had been prosecuted without probable cause. Unlike this case, there was no claim that a law enforcement official had acted in bad faith to undermine the reliability of a trial, such as by manufacturing false evidence, arranging for perjured testimony, or destroying exculpatory evidence.

For a claim limited to prosecution without probable cause, Justice Kennedy, joined by Justice Thomas, urged application of *Parratt* but emphasized that such a claim

> differs in kind from *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and the other criminal cases where we have recognized due process requirements not specified in the Bill of Rights. The constitutional requirements we enforced in those cases ensured fundamental fairness in the determination of guilt at trial. See, *e.g.*, *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (due process prohibits "deliberate deception of court and jury" by prosecution's knowing use of perjured testimony).

510 U.S. at 283, 114 S.Ct. 807 (citation omitted). In this passage, Justice Kennedy recognized that certain rights essential to the fundamental fairness of a criminal trial—such as the right in *Mooney* to a

trial free of deliberately perjured testimony—are beyond the reach of *Parratt*.

Armstrong's claims are based on one of these rights essential to fundamental fairness that are beyond the reach of *Parratt*. As we explain below, the right not to have exculpatory evidence deliberately destroyed stems directly from the right to disclosure of exculpatory evidence identified in *Brady v. Maryland*—which was itself "an extension of *Mooney*," *Brady*, 373 U.S. at 86, 83 S.Ct. 1194, cited in Justice Kennedy's *Albright* concurrence. These rights are all grounded in the due process guarantee of fundamental fairness in criminal prosecutions. A criminal defendant's right not to have exculpatory evidence destroyed deliberately, like other fundamental fairness rights of criminal defendants, "safeguard[s] the liberty of the citizen against deprivation through the action of the state" and "cannot be deemed to be satisfied by mere notice and hearing." See *Mooney*, 294 U.S. at 112, 55 S.Ct. 340.

So it comes as no surprise that *Parratt*'s application has been rejected in the rare wrongful conviction cases where defendants have raised it. In *Castellano v. Fragozo*, 352 F.3d 939 (5th Cir.2003) (en banc), the plaintiff proved at trial that a police officer had manufactured evidence and arranged for perjured testimony, leading to the wrongful conviction. On appeal, the defendants relied on *Parratt* to argue there had been no due process violation. The en banc Fifth Circuit rejected the *Parratt* argument. The plaintiff had not claimed merely that he was prosecuted without probable cause or that the result of his trial was wrong. He had instead shown that a defendant had manufactured and perjured evidence that had violated fundamental constitutional rights and had undermined his right to a fair determination of guilt or innocence at his trial. *Id.*

at 957–58. Armstrong has alleged parallel violations: that Norsetter's destruction of exculpatory evidence prevented him from having a fair trial to determine guilt or innocence, and that the other defendants' destruction of exculpatory evidence made it impossible for him to have a fair trial but also kept him in prison for three extra years.

In *Newsome v. McCabe*, 256 F.3d 747 (7th Cir.2001), we drew essentially the same line that the Fifth Circuit did. *Newsome* is cited most often for its rejection of a constitutional tort of malicious prosecution where a state provides a meaningful tort remedy for malicious prosecution. That reasoning relied on Justice Kennedy's concurring opinion as the controlling view in *Albright v. Oliver*, 510 U.S. 266, 281–86, 114 S.Ct. 807, 127 L.Ed.2d 114. See *Newsome*, 256 F.3d at 750–51. And that reasoning applied in both *Albright* and *Newsome* to hold that there is no stand-alone federal constitutional right not to be prosecuted without probable cause, at least if a state-law remedy is available.

But *Newsome* also held that the same argument based on *Parratt* did not bar a claim that police officers had withheld exculpatory evidence from the prosecutor and thus the defense. *Id.* at 752–53 (affirming denial of qualified immunity for claim based on this theory). The plaintiff in *Newsome* was allowed to proceed on that theory, despite *Parratt*, and that part of *Newsome* provides the closest parallel to Armstrong's claims for destruction of exculpatory evidence. See also *Castellano*, 352 F.3d at 962 (Jones, J., concurring in relevant part) (agreeing that *Parratt* did not bar the plaintiff's due process claim

based on manufactured evidence and perjured testimony and citing opinions from several circuits that allowed such claims to go forward).[3]

No court has accepted the defendants' argument that the *Parratt* analysis applies when the plaintiff is alleging that wrongful conduct corrupted fair fact-finding in the criminal justice system. We will not be the first. We will, however, explain further our reasoning for rejecting *Parratt* as an obstacle to Armstrong's claims. When *Parratt* and its progeny are understood properly, it becomes clear that Armstrong can proceed on his claim because the defendants' actions were not "random and unauthorized" within the meaning of *Parratt* and that state tort law does not provide an adequate remedy.

2. *The Rationale for and Scope of Parratt and Hudson*

We start with the rationale for *Parratt* and *Hudson*, as explained in those opinions and later cases. In *Parratt*, prison staff negligently lost some personal property ("hobby materials") that a prisoner had purchased. The prisoner sued under 42 U.S.C. § 1983 for deprivation of his property without due process of law, arguing that he was entitled to a hearing before a state actor permanently deprived him of his property. In a pragmatic decision, the Supreme Court held that the prisoner had failed to state a claim for relief under the Due Process Clause of the Fourteenth Amendment. *Parratt*, 451 U.S. at 539–40, 101 S.Ct. 1908. A predeprivation hearing was not possible, *id.* at 541, 101 S.Ct. 1908, so a meaningful postdeprivation tort remedy provided all the

---

**3.** Defendants find some support for their reading of *Parratt* and *Hudson* in Judge Barksdale's partial dissent in *Castellano*, 352 F.3d at 967–72, which read both cases broadly as applying essentially to any claim for

deprivation of procedural due process. Like the Fifth Circuit majority, though, we disagree with that reading for the reasons explained above.

process that could be expected and thus all the process that was due. *Id.* at 543, 101 S.Ct. 1908. Also important for present purposes, "the deprivation did not occur as a result of some established state procedure. Indeed, the deprivation occurred as a result of the unauthorized failure of agents of the State to follow established state procedure." *Id.*

In *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), the Court extended the reasoning of *Parratt* from a claim based on negligence to a claim that a guard had *intentionally* destroyed a prisoner's property (including legal papers) in a "shakedown" search of his cell. The Court explained that a pre-deprivation hearing would be no more practical for a "random and unauthorized" deprivation of property that was intentional than for one that was negligent. *Id.* at 533, 101 S.Ct. 1908. The prisoner in *Hudson* was also left to his state-law remedies.

It is possible to read these two cases broadly, as defendants do, in a way that would bar virtually all § 1983 due process claims so long as state law offers some post-deprivation remedy. That reading would conflict with decades of precedent establishing that violations of due process are in most instances federal claims based on federal rights and are actionable under § 1983. As we explained in *Tavarez v. O'Malley,* 826 F.2d 671, 675 (7th Cir.1987), for example, under a broad reading of *Parratt,* "even such classic constitutional-tort cases as that of the policeman who kills a suspect in order to bypass the cumbersome procedures of the criminal justice system would not be actionable, provided the killing was a tort under state law." Or consider the body of due process law protecting tenured public employees from be-

ing fired without prior notice and an opportunity to be heard. See, e.g., *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and their progeny. If a post-deprivation tort remedy were sufficient to cure any due process problem, as defendants argue here, *Parratt* and *Hudson* would have erased that body of law.

An expansive reading of *Parratt* might even jeopardize *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), which held that recipients of welfare benefits had a right to a hearing before their benefits could be terminated, even if later awards of retroactive benefits might compensate for erroneous termination. If defendants' argument were correct here and a post-deprivation remedy cured any failure to provide a fair pre-deprivation hearing, then these and other fields of due process law would be undermined.

■ Moreover, it is well established that the fact that a public official violates state law does not mean that the federal Constitution has not also been violated or that relief is not available under § 1983. See *Monroe v. Pape,* 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (plaintiff could seek relief under § 1983 for police officers' violation of his Fourth Amendment rights even if police also violated state law).[4] A broad reading of *Parratt* is in tension with the Court's holding that the federal remedy under § 1983 "is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." *Id.* Accordingly, *Parratt* cannot apply simply because the defendant official's actions

---

4. On grounds not relevant here, *Monroe* was overruled in part by *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which held that municipalities are suable "persons" under § 1983.

were prohibited by state law and subject to a tort remedy.

A closer reading of *Parratt, Hudson,* and later cases shows that the Supreme Court never intended *Parratt* to reach as broadly as the defendants argue. The Court's decisions make clear that *Parratt* is limited in three ways: first, "random and unauthorized" conduct means unforeseeable misconduct that cannot practicably be preceded by a hearing; second, misconduct that is legally enabled by a state's broad delegation of power is not "random and unauthorized"; and third, an official's subversion of established state procedures is not "random and unauthorized" misconduct.

First, to count as "random and unauthorized," misconduct must be misconduct of state officials that the State cannot foresee and that cannot be the subject of a meaningful pre-deprivation procedure. *Parratt,* 451 U.S. at 541, 101 S.Ct. 1908. This point is illustrated by *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), in which the Court allowed a due process claim despite a *Parratt* argument based on adequate state remedies because the misconduct that resulted in the deprivation was predictable and could have been prevented by a pre-deprivation hearing.

The plaintiff in *Zinermon* had requested voluntary admission to a state mental hospital. His specific claim was that state officials had deprived him of his liberty without due process of law by allowing him to commit himself without first ensuring that he was competent to give informed consent. The Court found that the danger of such deprivations was foreseeable and preventable through pre-deprivation procedures: "It is hardly unforeseeable that a person requesting treatment for mental illness might be incapable of informed consent...." 494 U.S. at 136, 110 S.Ct. 975.

Second, the Court further explained that an official's exercise of broad delegated power is not within the limited meaning of "random and unauthorized" acts under *Parratt. Zinermon* held that the conduct was not unauthorized even though it violated state law because the state's broad delegation of authority to a state official enabled the deprivation of liberty. Speaking of the officials who admitted Burch without ensuring that he was competent to consent, the Court said: "The State delegated to them the power and authority to effect the very deprivation complained of here ... and also delegated to them the concomitant duty to initiate the procedural safeguards set up by state law to guard against unlawful confinement." *Id.* at 138, 110 S.Ct. 975. Therefore, the Court concluded, the "deprivation here is 'unauthorized' only in the sense that it was not an act sanctioned by state law, but, instead, was a 'depriv[ation] of constitutional rights ... by an official's abuse of his position.'" *Id.* (alteration in original), quoting *Monroe,* 365 U.S. at 172, 81 S.Ct. 473. See also *Daily Services, LLC v. Valentino,* 756 F.3d 893, 910 (6th Cir.2014) (Moore, J., concurring in part and dissenting in part) (explaining that *Zinermon* reasoned that the conduct of state officials in failing to follow state-mandated procedures was authorized because they were legally empowered to effect the deprivation). Thus, the fact that a public official has used his power to deprive a person of property or liberty in a way that also violates state law does not necessarily defeat a federal due process claim.

Third, the Court held in *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), a case decided in the immediate wake of *Parratt,* that an official's mistaken subversion of established state procedures is not "unauthorized" conduct. In *Logan* the Court considered a claim that the plaintiff was

deprived of property because a state officer mistakenly subverted the prescribed state procedures. Logan had asserted a state-law claim for disability discrimination in employment. He was required to bring his claim through a state agency, and the agency made a mistake in scheduling a required conference. The state courts ruled that the agency's mistake required dismissal of Logan's claim.

The *Logan* Court found that the feature of state law requiring dismissal of a presumably valid claim because a state actor had made a mistake deprived the plaintiff of property without due process of law. 455 U.S. at 436, 102 S.Ct. 1148. The Court rejected a defense argument based on *Parratt*. The Court explained that the tortious loss of property in *Parratt* had been the result of " 'a random and unauthorized act by a state employee ... not a result of some established state procedure.' " *Id.* at 435–36, 102 S.Ct. 1148 (omission in original), quoting *Parratt*, 451 U.S. at 541, 101 S.Ct. 1908. In *Logan*, by contrast, "it is the state system itself that destroys a complainant's property interest, by operation of law, whenever the Commission fails to convene a timely conference—whether the Commission's action is taken through negligence, maliciousness, or otherwise. *Parratt was not designed to reach such a situation,*" where the loss occurred through "established state procedure," even where a mistake had been made in carrying out that procedure. *Id.* at 436, 102 S.Ct. 1148 (emphasis added).

To support their much broader reading of *Parratt*, which fails to recognize these three limitations, defendants here quote *Hood v. City of Chicago*, where we said that *Parratt* meant that " 'a victim of a property or liberty deprivation who has recourse to an adequate state remedy has not been denied due process of law.' " 927 F.2d 312, 314 (7th Cir.1991), quoting *Guen-*

*ther v. Holmgreen*, 738 F.2d 879, 882 (7th Cir.1984) (some internal quotations marks omitted). The quoted language is an incomplete and overly broad statement of the *Parratt* doctrine.

Our later cases have recognized more accurately that the *Parratt* doctrine applies only to conduct that is "random and unauthorized" in the sense that the state could not predict the conduct causing the deprivation, could not provide a pre-deprivation hearing as a practical matter, and did not enable the deprivation through established state procedures and a broad delegation of power. See *Veterans Legal Defense Fund v. Schwartz*, 330 F.3d 937, 940 (7th Cir.2003) ("*Parratt* essentially stands for the rule that when predeprivation hearings are impractical because the actions of the state officers were 'random and unauthorized' the state is only responsible for providing postdeprivation remedies."); *Cushing v. City of Chicago*, 3 F.3d 1156, 1165 (7th Cir.1993) (acknowledging that " '*Zinermon* narrowed the scope of *Parratt*'s application in certain factual circumstances' " and emphasizing the relevance of the predictability of the deprivation), quoting *Easter House v. Felder*, 910 F.2d 1387, 1400 (7th Cir.1990) (en banc); *Easter House*, 910 F.2d at 1400 (interpreting *Zinermon* to counsel a narrow reading of potentially broad language in *Parratt*: "the dispositive factor in determining whether *Parratt* will indeed apply in a given situation is still whether the state actor's conduct is 'random and unauthorized' or, as the Court has rephrased it, whether the state actor's conduct is 'predictable and authorized' ").

To sum up, the *Parratt* doctrine responded to a practical problem in a narrow subset of procedural due process cases, where a plaintiff contends that the state must provide notice and a hearing before carrying out a deprivation of liberty or

property, but where a pre-deprivation hearing simply is not practical. In both *Parratt* and *Hudson,* the plaintiffs complained they had been deprived of property with no process at all, so they sought to vindicate their right to notice and an opportunity to be heard through § 1983. The Court responded in *Parratt* with a special application of the *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), balancing test: *"Parratt* and *Hudson* represent a special case of the general *Mathews v. Eldridge* analysis, in which postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide." *Zinermon,* 494 U.S. at 128, 110 S.Ct. 975.

The familiar test weighs three factors to determine what process is due: first, the private interest at stake; second, the degree to which more process will make a difference in the risk of wrongful deprivation; and third, the cost to the government of providing more procedural protection. *Mathews,* 424 U.S. at 335, 96 S.Ct. 893. *Parratt* and *Hudson* held that in cases where the deprivation is unpredictable, no pre-deprivation hearing is required because it would be utterly impractical. Viewed through the lens of *Mathews,* more process is unlikely to make a difference in the risk of deprivation when the deprivation is caused by random and unpredictable acts and not through established state procedures.

### 3. *The Differences Between the Parratt Doctrine and This Case*

When *Parratt* and its progeny are read carefully, then, and are read against the broader sweep of due process jurisprudence, they do not bar Armstrong's claims based on deprivation of his liberty through deliberate destruction of exculpatory evidence. More specifically, *Parratt* does not bar Armstrong's claims because the defendants' conduct was not "random and unauthorized" and the available state remedies are not adequate.

First, the alleged conduct here was not "random and unauthorized" as the phrase is used in the *Parratt* doctrine. It is foreseeable that law enforcement officers will, on occasion, act overzealously to pursue conviction of the wrong person. See *Zinermon,* 494 U.S. at 136, 110 S.Ct. 975 (holding that foreseeable conduct is not "random and unauthorized"). Prosecutor Norsetter was acting within the broad delegation of power he had been given, see *id.* at 138, 110 S.Ct. 975 (holding that a deprivation by an official's abuse of position is not unauthorized), and Armstrong was deprived of his liberty through established state procedures, in the form of his criminal trial, see *Logan,* 455 U.S. at 435–36, 102 S.Ct. 1148 (holding that a deprivation resulting from a mistake in established state procedures is not "random and unauthorized").

This is not a case where a pre-deprivation hearing would have been utterly impractical, as was the case in both *Parratt* and *Hudson.* Armstrong was not deprived of his liberty until after he had gone through the most elaborate pre-deprivation procedural protections known to American law: a criminal trial. Instead, Armstrong's claim is that the procedure he was due—a fair criminal trial—was rendered unfair by Norsetter's deliberate wrongdoing. The same reasoning applies to Armstrong's claim against lab technicians Daily and Campbell since he alleges that their actions caused him to spend an additional three years in prison, which were also the product of established state procedures.

Second, even if we ignored the other limits to *Parratt* and *Hudson,* the state tort of malicious prosecution simply does

not provide an adequate remedy for the deprivations that Armstrong has alleged. At the most fundamental level, it is an absurd notion that a state-law tort remedy is an adequate and meaningful remedy in this situation and thus that there is no violation of the federal constitutional guarantee of due process of law. A person in Armstrong's position loses his liberty upon conviction at trial. He is deprived of his liberty unless and until he can win reversal of his conviction. Only then, years or even decades later, could he possibly pursue a damages remedy. An award of money damages decades later is of course better than nothing, whether in state court or federal court. At that point, it's all the civil legal system can offer. But by no stretch of the legal imagination can it be deemed an adequate or meaningful remedy for years of wrongful imprisonment such that one can say there was no constitutional violation in the first place. For the claims against Daily and Campbell, we discuss the causation issue in more detail below. Suffice it to say for now that the same reasoning applies to the last three years that Armstrong spent in prison.

For all of these reasons, the fact that state law might provide a tort remedy for the alleged wrongdoing by the defendants in this case does not bar Armstrong's claims.

### D. *Prosecutor Norsetter's Arguments*

We now turn to arguments specific to prosecutor Norsetter and the alleged destruction of the potentially exculpatory drug paraphernalia that the police collected from Kamps' apartment. Armstrong alleges that Norsetter acted in bad faith and was intent on prosecuting him for this crime from the beginning, regardless of the evidence. Armstrong never had the opportunity to present this potentially exculpatory evidence at his 1981 trial ending with his conviction for murder and sexual assault. He served 26 years of his life sentence before that conviction was overturned and another three years before the charges were dismissed.

The district court found the factual allegations in Armstrong's complaint sufficient to state a due process claim. Norsetter maintains that Armstrong's claim must be dismissed because the allegations of the complaint show he is entitled to qualified immunity. On appeal, Norsetter repeats two arguments that failed to persuade the district court: (1) the destruction of the evidence did not violate Armstrong's right to procedural due process; and (2) Norsetter's alleged actions in 1980 violated no law clearly established at that time.

### 1. *Violation of a Constitutional Right*

To show that Norsetter's actions in causing the loss or destruction of the drug paraphernalia evidence violated his constitutional right to due process of law, Armstrong relies on *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), where the Supreme Court held that the destruction of potentially exculpatory evidence is not a denial of due process of law unless it is done in bad faith. See also *California v. Trombetta,* 467 U.S. 479, 488–89, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) (good faith failure to preserve evidence with no apparent exculpatory value did not violate due process). Norsetter argues that Armstrong's "allegations of bad faith are inherently contradictory," that the drug paraphernalia evidence "did not have 'apparent' potentially exculpatory value," and that this evidence was not particularly important because the alleged cocaine user would likely have left other prints in the apartment.

Whatever weight these argument may have at a later stage of the case, they cannot prevail in this appeal from a denial

of a motion to dismiss on the pleadings. We must accept the facts pled in the complaint as true and draw all reasonable inferences in Armstrong's favor. In that light, Armstrong has sufficiently alleged facts that Norsetter knew the evidence had significant exculpatory value and acted in bad faith.

■ Armstrong alleges that Norsetter acted "with bad faith from the very beginning of the investigation." And this is no bare legal conclusion. Rule 9(b) allows states of mind to be alleged generally. Even if it did not, the facts alleged here certainly permit a reasonable inference that Norsetter was acting in bad faith. See *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The complaint states that Norsetter admitted under oath in a 2009 state court hearing on prosecutorial misconduct that "from the beginning he believed the Plaintiff guilty of the rape and murder of Charise Kamps, and would never believe otherwise no matter what exculpatory evidence exonerated the Plaintiff or pointed to another suspect." The complaint also contains other allegations that paint Norsetter as pursuing Armstrong through any means necessary, including violating court orders on access to evidence and suppressing the post-conviction report that Stephen Armstrong had confessed to Kamps' murder. These allegations are more than sufficient to allow the inference that Norsetter was acting in bad faith.[5]

Armstrong also alleges detailed facts to support his contention that the drug paraphernalia evidence was, "even to the most cursory consideration, plainly probative to both general motive for the crime" and Armstrong's innocence. The drug paraphernalia was lying on the kitchen table in Kamps' home and was likely used recently. It could show who last saw her the night of the murder. Armstrong also alleges that Norsetter and the investigating detectives knew that he denied using cocaine with the victim, so the paraphernalia could corroborate his denial and point to another suspect. These allegations fairly support the inferences—which must be drawn in Armstrong's favor at this stage—both that the evidence could have exculpatory value and that Norsetter must have known that.

Armstrong's allegations are sufficient to state a constitutional violation. In *Youngblood* the Supreme Court took for granted that the destruction of such evidence amounted to a denial of due process of law if done in bad faith, though the Court found no constitutional violation where the police were merely negligent. 488 U.S. at 58, 109 S.Ct. 333 ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law"). Armstrong has alleged facts that permit the reasonable inference that Norsetter acted in bad faith to cause the loss of this potentially exculpatory evidence. Norsetter may dispute these allegations and the inferences one could draw in later stages of litigation, but they suffice for now, on the pleadings.[6]

---

**5.** Norsetter objects that the court may not consider later events because he is entitled to absolute prosecutorial immunity for his actions after he charged Armstrong. While Norsetter receives absolute immunity *from suit* arising out of his truly prosecutorial tasks, e.g., *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), we do

not see why that rule should prohibit the use of later prosecutorial actions as evidence that sheds light on the prosecutor's state of mind in earlier, non-immune actions.

**6.** Judge Flaum concludes that Armstrong has not alleged sufficiently that Norsetter acted in bad faith in 1980 when the drug evidence

### 2. *Clearly Established Law in 1980*

*Youngblood* was of course decided in 1988, eight years after the events in question here. Norsetter argues that even if Armstrong has stated a claim against him under *Youngblood*, his conduct was not clearly unlawful in 1980. He first asserts that he violated no clearly established law because the drug paraphernalia evidence was only potentially exculpatory. The drug paraphernalia could have aided Armstrong only if it were tested and only if testing revealed someone else's fingerprints, which he says is all speculation because the evidence is gone. Even if the evidence had shown someone else's fingerprints, Norsetter argues, that would merely have pointed to an additional suspect without exonerating Armstrong. Norsetter suggests the Supreme Court .did not establish a legal duty to preserve *potentially* exculpatory evidence until *Youngblood* in 1988.

■ We disagree. This argument is refuted by both *Killian v. United States*, 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961), and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

*Killian* addressed .law enforcement's duty to preserve potentially exculpatory evidence. Killian was convicted of giving false testimony for lying about his involvement in the Communist Party. *Killian*, 368 U.S. at 235, 82 S.Ct. 302. A witness working for the government testified he had seen Killian participate in party meetings. *Id.* at 237, 82 S.Ct. 302. The witness, Ondrejka, was reimbursed for party membership fees and travel expenses by orally reporting his expenses to an FBI agent, who took notes and saw that Ondrejka was paid. *Id.* at 238, 82 S.Ct. 302. Killian wanted the government to produce the FBI agents' notes of the reimbursement payments. *Id.* at 238–39, 82 S.Ct. 302. The government refused but offered a summary of payments showing the date, amount, and reason for each payment. *Id.* at 238, 82 S.Ct. 302.

When the case reached the Supreme Court, the· Solicitor General represented that the FBI had destroyed the original notes "in accord with normal practice" before Killian's trial. 368 U.S. at 241, 82 S.Ct. 302. The Solicitor General argued that there was no harm from the destruction of the notes because all relevant information from them was incorporated into the summary report or contained in Ondrejka's narrative statements, both of which were given to the defense. *Id.* at 240–41, 82 S.Ct. 302. But Killian still asserted a violation of statutory and constitutional due process rights because the

---

disappeared. We respectfully disagree on both substantive and procedural grounds. Substantively, Armstrong has alleged a decades-long course of events in which Norsetter tried to frame him for the rape and murder of Charise Kamps and then to keep him in prison as exculpatory evidence accumulated over the years. While it is certainly possible that the loss of the drug evidence was merely negligent, as Judge Flaum concludes, as we consider the pleadings we must give plaintiff, not defendant, the benefit of reasonable inferences from his well-pled allegations. *Parish v. City of Elkhart*, 614 F.3d at 679 (wrongful conviction case); see also Fed.R.Civ.P. 9(b) (allowing states of mind to be alleged general-

ly). Armstrong's allegation of bad faith is at least plausible.

In terms of procedure, recall that Norsetter has appealed from the *denial* of his motion to ·dismiss on qualified immunity. If an appellate court finds insufficient detail in a complaint that the district court found sufficient, the remedy should be a remand to the district court with an opportunity to amend the complaint, not a dismissal with prejudice as sought by Norsetter. See *Iqbal v. Ashcroft*, 574 F.3d 820, 822 (2d Cir.2009) (after remand of *Iqbal* by Supreme Court, remanding to district court to allow amendment of complaint).

government "admits the destruction of evidence that may have been helpful." *Id.* at 241, 82 S.Ct. 302.

The Court found no statutory or constitutional violation, but only on the assumption that the Solicitor General was correct and the government acted in good faith: "If the agents' notes of Ondrejka's oral reports of expenses were made only for the purpose of transferring the data thereon to the receipts to be signed by Ondrejka, and if, after having served that purpose, they were destroyed by the agents in good faith and in accord with their normal practice, it would be clear that their destruction did not constitute an impermissible destruction of evidence nor deprive petitioner of any right." 368 U.S. at 242, 82 S.Ct. 302. The Court then remanded to the district court with specific directions: "If ... the District Court finds that the Solicitor General's representations are untrue in any material respect, it shall grant petitioner a new trial." *Id.* at 244, 82 S.Ct. 302.

Norsetter argues that the *Killian* remand order was limited to determining whether the non-disclosure of two other documents was harmless error. This interpretation is untenable in light of the Court's order that the petitioner be granted a new trial if "the Solicitor General's representations are untrue in any material respect," 368 U.S. at 244, 82 S.Ct. 302, and the plainly conditional ruling on the destruction of the notes, *id.* at 242, 82 S.Ct. 302.

Based on *Killian,* then, law enforcement officials were on notice long before 1980 that the duty to preserve was not limited to obviously exculpatory evidence. In fact, the connection between evidence in question in *Killian* and guilt or innocence of the charged crime was much more attenuated than the connection here between the drug paraphernalia and Armstrong's guilt or innocence. It is not entirely clear under what theory Killian thought the FBI agents' notes would be relevant, only that he insisted he had the right to inspect them free from bad-faith government interference. In this case, by contrast, Armstrong has advanced a straightforward theory for the relevance of the drug paraphernalia: if tested, it probably would have revealed the fingerprints or other evidence of the real killer.

The Supreme Court acknowledged the significance of *Killian* when it faced the question of the duty to preserve evidence decades later in *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). The *Trombetta* Court said "the instant case is reminiscent of *Killian,*" a case "in which we have discussed due process constraints on the Government's failure to preserve potentially exculpatory evidence." *Id.* at 487, 104 S.Ct. 2528. And our colleagues in other circuits have consistently interpreted *Killian* in this manner. See *United States v. Sullivan,* 919 F.2d 1403, 1427 & n. 37 (10th Cir.1990); *United States v. Arra,* 630 F.2d 836, 848–49 (1st Cir.1980) (relying in part on *Killian* in announcing a three-pronged inquiry—materiality, prejudice, and good or bad faith—for due process claims for destruction of evidence); *United States v. Moore,* 453 F.2d 601, 603–04 (3rd Cir.1971) (citing *Killian* but finding no error because FBI agent's notes "were destroyed in good faith").

Norsetter also asserts that a prosecutor had no clearly established legal duty to refrain from destroying evidence of any kind in 1980. While he acknowledges that *Brady v. Maryland* established a duty to disclose material evidence to the defense, 373 U.S. at 86, 83 S.Ct. 1194, he says there was no non-disclosure here because Armstrong was aware that the evidence was destroyed before trial.

This second argument fails in light of *Killian,* but it also strains *Brady* to the point of absurdity. Though *Brady* did not announce a duty to preserve evidence, a duty to refrain from bad-faith *destruction* flows necessarily, and obviously, from its familiar holding that *suppression* of material exculpatory evidence violates due process. *Brady,* 373 U.S. at 86, 83 S.Ct. 1194. *Brady* would mean nothing if, as Norsetter argues, a prosecutor could comply with its command by deliberately destroying exculpatory evidence and then disclosing the fact of destruction to the defense.

Under Norsetter's argument, a reasonable police investigator could have believed in 1980 that if he possessed exculpatory evidence, he had an obligation to disclose it to the defense *unless he deliberately destroyed it first.* No reasonable police officer or prosecutor could have believed that in 1980. That is not a reasonable interpretation of *Brady,* and neither Norsetter nor the partial dissenting opinion has directed us to any courts that have adopted it. Under the law in 1980, including at least *Killian* and *Brady,* prosecutors had a clearly established legal duty not to act in bad faith to destroy evidence, which if suppressed or destroyed, "creates a reasonable doubt that did not otherwise exist." See *United States v. Agurs,* 427 U.S. 97, 112–13, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (defining material evidence that must be disclosed under *Brady* ).

The Supreme Court wrote in *Trombetta* that it had "never squarely addressed the government's duty to take affirmative steps to preserve evidence on behalf of criminal defendants." 467 U.S. at 486, 104 S.Ct. 2528. In light of both *Killian* and *Brady,* that comment is best understood as meaning that the Court had never addressed a duty to preserve evidence above and beyond the duty to act in good faith under *Killian* and the duty to disclose material evidence under *Brady.* The question in *Trombetta* was whether the duty to preserve extended to cases where the government did not act in bad faith. The Court was assuming that bad-faith destruction of evidence was already unlawful because of *Killian* and *Brady,* though it did not dwell on this point because there was no allegation of bad faith in *Trombetta. Id.* at 489, 104 S.Ct. 2528.

*Killian* and *Brady* thus gave sufficient notice to defeat Norsetter's claim of qualified immunity on this ground. See *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (denying qualified immunity where "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful") (citations and internal quotations omitted). And even if all this were not enough, this court had ruled expressly in 1978 that destroying and falsifying evidence was unlawful, further supporting that this rule was uncontroverted by 1980. *Heidelberg v. Hammer,* 577 F.2d 429, 432 (7th Cir.1978). The *Heidelberg* opinion on the point was terse, but that only emphasizes the strength of *Brady* in this regard.

The district court properly rejected Norsetter's qualified immunity defense at this stage. Discovery or evidence at trial may show that Armstrong's allegations of bad faith are not true or that Norsetter was not responsible for the loss of the drug paraphernalia evidence. In holding that the complaint alleges a violation of clearly established constitutional law, we express no opinion on the propriety of qualified immunity at a later stage of litigation.

*E. Daily and Campbell's Arguments*

Armstrong's claim against the two state lab technicians, Daily and Campbell, stems

from their handling of evidence after his conviction was vacated and the case was remanded for a new trial. Armstrong alleges that Daily and Campbell violated his rights by performing testing that consumed a critical piece of evidence—the newly discovered semen stain on the victim's bathrobe belt. That final test, the Y–STR analysis, examined only the Y chromosome and could not distinguish between men with the same father. The choice of the Y–STR test may have been especially devious because, if the real killer was Armstrong's brother Stephen, consistent with the confession reported to Norsetter back in 1995, then the Y–STR test would seem to implicate plaintiff Ralph Armstrong while also depriving him of the ability to clear his name through tests that could have distinguished between him and Stephen.

Armstrong presents two legal theories for his claim against the state lab technicians. First, he argues the exculpatory value of the semen sample was apparent to Daily and Campbell so that its destruction was plainly unlawful under *Trombetta*, 467 U.S. at 488–89, 104 S.Ct. 2528. In the alternative, he argues that even if the semen sample was only potentially exculpatory, Daily and Campbell acted unlawfully because they destroyed it in bad faith. See *Youngblood*, 488 U.S. at 58, 109 S.Ct. 333. Both theories are sufficient to assert a violation of Armstrong's right to due process of law.

Daily and Campbell offer two arguments to support the defense of qualified immunity. First, they argue that the destruction of the semen sample violated no constitutional right because Armstrong was not retried and trial is an essential element of this constitutional claim. Second, they argue that even if their alleged actions violated a constitutional right, that right was

not clearly established in 2006. We address these arguments in turn.

### 1. *Is a Trial Needed for a Constitutional Violation?*

■ Daily and Campbell's argument on the first prong of the qualified immunity defense is that Armstrong asserts a due process right to a fair trial, so the fact that he was not retried on remand defeats his claim. (Recall that a state judge ordered dismissal of the charges against Armstrong because the evidence destruction had made a fair trial impossible.) We reject this argument. We first explain the basis of Armstrong's claim and then turn to the defense argument.

The constitutional violation that Armstrong asserts is the deprivation of his liberty without due process of law, as the result of the destruction of evidence by a state actor. See *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir.2000) (defining the right at issue as "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity"). Though the most common liberty deprivation cases are based on post-trial incarceration after a wrongful conviction, the essential elements of this constitutional claim are more general and not limited to wrongful convictions. See *Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir.2014) ("[T]he fabrication of evidence harmed the defendant before and not just during the trial, because it was used to help indict him."), citing *Julian v. Hanna*, 732 F.3d 842, 847 (7th Cir.2013).

Armstrong's claim therefore has two essential elements: (1) the defendant destroyed exculpatory evidence in bad faith or engaged in other misconduct (2) that caused a deprivation of the plaintiff's liberty. Even assuming for the sake of argument that Armstrong needed to allege in

his pro se complaint facts that permit the inference that defendants acted with improper motive, his complaint clearly satisfies the first element. He has alleged (plausibly) that Daily and Campbell acted in bad faith to destroy exculpatory evidence. He has also alleged the second element, that defendants' actions caused him to suffer a deprivation of liberty. Taking Armstrong's allegations as true, and giving him the benefit of favorable inferences, we must assume that Daily and Campbell's actions caused Armstrong to suffer a loss of liberty as he languished in prison for three more years after Daily said he was excluded by the earlier DNA tests and after the last sample had been destroyed in the Y–STR test of the newly discovered stain.

Most of defendants' support for the proposition that the plaintiff must have been tried before he can sue is drawn from cases applying the *Brady* obligation to *disclose* exculpatory evidence. See *Ray v. City of Chicago*, 629 F.3d 660, 664 (7th Cir.2011) (expressing doubt whether a plaintiff has a civil claim for a *Brady* violation "when the individual is merely charged with a crime, but never fully prosecuted"); *Taylor v. Waters*, 81 F.3d 429, 435–36 (4th Cir.1996) (rejecting a due process claim for failure to disclose exculpatory evidence to a pretrial detainee).

In this respect, the *Brady* cases involving failures to disclose evidence are plainly distinguishable from this case involving destruction of evidence. We have often observed that "*Brady* does not require pretrial disclosure." *United States v. Grintjes*, 237 F.3d 876, 880 (7th Cir.2001); *Buckley v. Fitzsimmons*, 20 F.3d 789, 797 (7th Cir.1994); see also *Whitlock*, 682 F.3d at 588 (explaining *Brady* as imposing an obligation on state actors to disclose "exculpatory evidence that is discovered before or during trial"). The prosecution may fulfill its *Brady* obligation through disclosure in the time leading up to or sometimes even during trial. The critical question under *Brady* is whether the exculpatory evidence is "disclosed in time for the defendant to make use of it." *Grintjes*, 237 F.3d at 880. We therefore have been hesitant to recognize a § 1983 cause of action for the withholding of exculpatory evidence before trial because the constitutional violation is not even ripe if the prosecution can still meet its *Brady* obligation by disclosing the evidence in time for the defendant to use it.

In this respect, Armstrong's claim for destruction of exculpatory evidence is different. Under the reasoning of *Killian* and *Youngblood*, bad-faith destruction of exculpatory evidence is an immediate constitutional violation. It may or may not eventually cause harm, but harm is a separate issue. Destruction is not easy to remedy. Deliberate destruction of evidence with potential or apparent exculpatory value can make it impossible for the accused to receive due process of law, regardless of the procedural posture of the criminal case at the time of the destruction. See *Trombetta*, 467 U.S. at 482–83, 104 S.Ct. 2528 (considering claims on merits but rejecting claims where evidence had no apparent exculpatory value and was destroyed in good faith); *Youngblood*, 488 U.S. at 58, 109 S.Ct. 333 (reviewing reversal of conviction on direct appeal and holding that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law"). The outright destruction of exculpatory evidence raises immediate constitutional concern because the resulting prejudice to the defense is permanent. Whatever unfairness results from the destruction will infect all future proceedings because the exculpatory evidence will continue to be unavailable.

We assume that the most common cases involving destruction of evidence are those where a defendant was wrongly convicted and imprisoned after a trial. But this case illustrates why the claim should not be limited to its most common version by a too-narrow requirement that the accused have been tried and convicted.

The only reason Armstrong did not face retrial after 2005 is that the defendants' conduct was so outrageous and harmful that a judge prohibited the prosecution from proceeding any further, even with crimes as serious as the brutal murder and rape of Ms. Kamps. Wisconsin courts evaluating the State's actions in this case found bad faith. One judge found that "a series of conscious decisions" "seriously prejudice[d] the defense." After finding alternative evidentiary remedies "insufficient," that judge dismissed the criminal case against Armstrong because his "due process right to a fair trial has been irreparably compromised." Yet now the civil defendants argue that the judge's dismissal of the case immunized them from civil liability for the constitutional violation of intentionally destroying the evidence that Armstrong needed to prove his innocence and regain his liberty.

Under these circumstances, requiring a plaintiff to undergo a second trial and conviction to pursue a civil claim under § 1983 would work an obvious injustice. It would deny victims of the most egregious evidence destruction—for whom dismissal is appropriate because a fair trial is impossible—a civil remedy for their loss of liberty. We have previously rejected drawing lines in § 1983 law that "would leave a victim of graver misconduct ... completely unprotected." *Fields,* 740 F.3d at 1113.

Of course, to say that the improper destruction of exculpatory evidence violates due process is not to say that every criminal defendant may bring a § 1983 suit whenever any piece of exculpatory evidence is lost or destroyed. A plaintiff must still establish "one of the necessary elements of a constitutional tort: that the officer's act ... caused any injury." *Whitlock,* 682 F.3d at 582, citing *McCree v. Grissom,* 657 F.3d 623, 624 (7th Cir.2011). For "there is no tort without an actionable injury caused by the defendant's wrongful act." *Fields,* 740 F.3d at 1111, citing *Buckley,* 20 F.3d at 796. We have observed, for example, that an accused has no claim against an officer who fabricates evidence and puts the evidence in a drawer, never to be used. *Whitlock,* 682 F.3d at 582, citing *Buckley,* 20 F.3d at 795. Similarly, if a state officer destroys evidence that would exculpate a person who is never prosecuted, there would be no injury and thus no constitutional tort actionable under § 1983.

That is not what Armstrong has alleged, however. His allegations permit the reasonable inference that the defendants' destruction of evidence was both a cause-in-fact and a proximate cause of Armstrong's last three years in prison. Our circuit's approach to *Brady* claims is instructive on this point. Though we have not yet recognized a *Brady* claim under § 1983 absent a trial resulting in conviction, we have said that we may do so if the plaintiff shows "that if all parties had known of some piece of exculpatory evidence, the prosecution would not have moved forward with charges, the grand jury would not have indicted [the plaintiff], or the trial court would have granted a motion to dismiss the indictment." *Mosley v. City of Chicago,* 614 F.3d 391, 397 (7th Cir.2010).

Armstrong's allegations support the inference that a reasonable prosecutor in these circumstances would not have moved forward with the charges in 2006 and kept Armstrong in prison if the semen stain had not been destroyed and the evidence had

been provided to the defense for further testing.[7] Much of the physical evidence—which the prosecution repeatedly and erroneously portrayed in the 1981 trial as conclusively establishing Armstrong's guilt—had already been thrown into doubt by new DNA analysis and other laboratory findings that led the Wisconsin Supreme Court to conclude that the real controversy of identification was not fully tried. *Armstrong,* 700 N.W.2d at 129. And Daily had concluded from earlier testing of the bathrobe and the belt that Armstrong was excluded as the source of the semen. The destroyed stain on the murder weapon was therefore "the most critical and probative physical evidence remaining in the case," as Armstrong alleges. Its destruction, and especially the potentially false positive generated by the defendants' choice of the Y–STR test, plausibly caused the case to proceed, with Armstrong still in prison, even though the testing of other evidence tended to exculpate Armstrong.

It is also a plausible inference from the complaint that Armstrong's continued imprisonment was reasonably foreseeable to Daily and Campbell at the time they destroyed the semen sample. Again, the results of Daily's first analysis of the bathrobe and the belt had eliminated Armstrong as a possible source of any of the semen stains, including the newly discovered one on the belt. When the crucial sample was destroyed, Daily and Campbell were retesting the stain in an attempt to find inculpatory evidence. In fact, it is reasonable to infer from the allegations not only that Armstrong's continued imprisonment was reasonably foreseeable, but also that continued imprisonment was Daily and Campbell's *goal* in consuming

the last of the stain to perform the Y–STR test, which would be so misleading under these circumstances. The factual allegations in the complaint therefore add up to a viable claim that Daily and Campbell violated Armstrong's constitutional rights by destroying exculpatory evidence under both *Youngblood* and *Trombetta,* and that the destruction caused Armstrong to be deprived of liberty.

Our conclusion that Armstrong has alleged a constitutional violation actionable against Daily and Campbell under § 1983 causes us to disagree with some of the Tenth Circuit's broad language in *Morgan v. Gertz,* 166 F.3d 1307 (10th Cir.1999), but not necessarily with its holding. In *Morgan,* the plaintiff had been prosecuted for molesting his young stepdaughter. When police first questioned the girl in a recorded interview, she gave no indication she had been a victim of sexual abuse. When additional information surfaced, the police interviewed her again and she said her stepfather had sexually assaulted her. The second interview was recorded using the same tape and thus erased the recording of the first, exculpatory interview. The prosecutor disclosed to the defense the fact that the first interview had been exculpatory. At the end of the criminal trial, the jury convicted the stepfather, but the trial court ordered dismissal of the charges because of the deliberate destruction of exculpatory evidence. The accused stepfather later sued the detective and caseworker who had destroyed the evidence.

The Tenth Circuit affirmed summary judgment for the defendants. It wrote broadly: "Regardless of any misconduct by government agents before or during

---

7. Of course, it would be no defense that Norsetter himself would have prosecuted Armstrong regardless of the exculpatory evidence. The appropriate counterfactual to consider is whether a reasonable prosecutor under these circumstances would have moved forward with the charges.

trial, a defendant who is acquitted cannot be said to have been deprived of the right to a fair trial." *Morgan,* 166 F.3d at 1310. The court explained that § 1983 claims based on rights of access to evidence "fall into two distinct categories." *Id.* In the first category, where "all criminal charges were dismissed prior to trial," the Tenth Circuit observed, "courts have held universally that the right to a fair trial is not implicated, and, therefore, no cause of action exists under § 1983." *Id.* In the second category, where the defendant was convicted but is exonerated in collateral proceedings, courts have permitted § 1983 claims to proceed. *Id.*

The two categories of cases discussed in *Morgan* simply did not address the situation we face here. *Morgan* did not consider the possibility that a defendant could be imprisoned before (re)trial because of the deliberate destruction of exculpatory evidence. And the cases cited in *Morgan* to support the conclusion that courts have "universally" rejected pre-conviction § 1983 claims for destruction of evidence are simply not comparable. None concerned a pretrial deprivation of liberty resulting from the bad-faith destruction of evidence. See *Rogala v. District of Columbia,* 161 F.3d 44, 55–56 (D.C.Cir.1998) (plaintiff was never prosecuted, let alone imprisoned); *Taylor,* 81 F.3d at 435–36 & n. 5 (plaintiff claimed only failure to disclose evidence, not destruction of evidence); *McCune v. City of Grand Rapids,* 842 F.2d 903, 907 (6th Cir.1988) (same). And *Morgan* itself is distinguishable—the plaintiff did not allege or argue any pretrial deprivation of his liberty.

Daily and Campbell also attempt to recast Armstrong's claim as a garden-variety complaint of prolonged pretrial detention. That claim would be foreclosed in this circuit because we have already rejected a plaintiff's due process challenge to the length of his pretrial detention after the prosecutor discovered strong exculpatory evidence. *Garcia v. City of Chicago,* 24 F.3d 966, 971–72 (7th Cir.1994). We said the length of detention did not violate due process, though we identified other constitutional limitations on the prosecution, such as the *Brady* right to disclosure before trial and the Sixth Amendment speedy trial right. *Id.*

That principle is correct, but it poses no barrier to Armstrong's claim, which is based on the defendants' destruction of exculpatory evidence, not prolonged pretrial detention. The three years of prolonged imprisonment that he suffered show he was injured—an essential element of a constitutional tort—but that injury is actionable only if Armstrong can prove that it was caused by the unconstitutional act. He may pursue damages for that injury without running afoul of our holding in *Garcia* that prolonged pretrial detention is not independently actionable.

### 2. Clearly Established Law in 2006— Conduct v. Remedies

Armstrong has satisfied the first prong needed to defeat qualified immunity because he has alleged that Daily and Campbell violated his constitutional rights by destroying exculpatory evidence under *Youngblood* or *Trombetta.* We now turn to the second prong, whether it was clearly established in 2006 that such conduct violated the Constitution.

Daily and Campbell argue that even if Armstrong has a valid claim, the right he asserts was not clearly established by any controlling authority. See *Wilson v. Layne,* 526 U.S. 603, 617–18, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (affirming that government officials were entitled to qualified immunity where no "controlling authority in their jurisdiction" clearly established the rule on which the petition-

ers sought to rely). To support this argument, they point to ambiguity in this circuit's precedent and cases from other circuits that doubt whether withholding exculpatory evidence supports a due process claim by a criminal defendant who has not been tried and convicted. This debate or uncertainty, they argue, shows that reasonable judges and public officials could disagree. See, e.g., *Upton v. Thompson*, 930 F.2d 1209, 1217 (7th Cir. 1991) (circuit split indicated the rights at issue were "currently unsettled as a matter of constitutional law and therefore were not 'clearly established' "). Defendants argue that reasonable officials would not be aware that they violated a constitutional right in these circumstances—destroying evidence that would or could exculpate a criminal defendant detained in preparation for retrial.

 This argument is built on a basic misunderstanding about qualified immunity. The issue is not whether issues concerning the availability of a *remedy* are settled. The qualified immunity defense focuses instead on whether the official defendant's *conduct* violated a clearly established constitutional right. As we said in *Fields,* "when the question is whether to grant immunity to a public employee, the focus is on his conduct, not on whether that conduct gave rise to a tort in a particular case." 740 F.3d at 1114.

In *Fields,* we considered whether Wharrie, the prosecutor, was entitled to qualified immunity for fabricating evidence before the trial. (Wharrie had absolute immunity as a prosecutor for his later introduction of the evidence at trial.) *Fields* relied on cases where a state official fabricated evidence and then introduced it at trial to conclude that Wharrie was not entitled to qualified immunity because fabricating evidence clearly violated due process. 740 F.3d at 1114. "[T]he

immunity depends on the official's acts; the existence of a cause of action depends on the illegality of those acts *and* on whether an injury results, because, to repeat, no injury—no tort." *Id.* In other words, Wharrie lost his qualified immunity when he committed acts that were obviously unlawful, regardless of whether those acts caused the later injury needed for the claim to ripen into a constitutional tort.

This point is consistent with the way the Supreme Court has repeatedly described the defense of qualified immunity, in terms of whether the defendant official's "actions" or "conduct" violated clearly established law, not in terms of whether a defendant should have realized he would be held civilly liable for his actions or conduct. E.g., *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) ("conduct"); *Behrens v. Pelletier*, 516 U.S. 299, 305, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) ("conduct"); *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("actions"); *Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) ("actions"); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ("conduct").

 On the merits here, *Youngblood* and *Trombetta* had been the law of the land for more than a decade when Daily and Campbell destroyed the critical evidence. Those cases made clear that the bad-faith destruction of potentially exculpatory evidence—or destruction of evidence with apparent exculpatory value, even without bad faith—violated a criminal defendant's right to due process of law. And at this stage of the case, we must accept Armstrong's allegations that Daily and Campbell destroyed this evidence in bad faith and knowing of its exculpatory value.

Debate about the need for a trial or conviction goes to the question of injury, which is essential to proving liability but not relevant to qualified immunity. Focusing on the defendants' *conduct*—destroying a semen stain that had previously tested negative for Armstrong's DNA—it is clear that they had fair warning that this exculpatory evidence had to be preserved. Their alleged actions were objectively unreasonable in defying that command. The fact that their actions were so egregious as to cause dismissal of the charges before a retrial does not protect them from liability for injuries they caused. The district court correctly denied their motion to dismiss on the ground of qualified immunity.

We AFFIRM the decision of the district court denying defendants' motions to dismiss on the defense of qualified immunity.

FLAUM, Circuit Judge, concurring in part and dissenting in part.

While I join the majority's conclusion regarding the viability of Armstrong's claims against lab technicians Karen Daily and Daniel Campbell, I disagree with the conclusion that Armstrong's claim against prosecutor John Norsetter regarding the preservation of drug paraphernalia evidence is sufficient to remove the shield of qualified immunity. For this reason, I concur in part and respectfully dissent in part.

The facts of Ralph Armstrong's case are indeed troubling. All told, Armstrong spent 29 years in prison for a crime that he still claims he did not commit. After DNA evidence called into question the identity of Charise Kamps' killer—and Armstrong's conviction—Norsetter and his team resolved to re-try Armstrong in 2005. While preparing for re-trial, Norsetter directed lab technicians Daily and Campbell to perform a DNA test on a critical semen stain from the victim's bathrobe using a less-than-precise method. This testing occurred in violation of a trial court order, and also destroyed the stain, rendering it unusable for further testing. But regardless of what actions Norsetter took or directed in 2005, Armstrong's claim against Norsetter regarding evidence preservation concerns actions taken in 1980 and 1981. Specifically, Armstrong alleges in his complaint that Norsetter, while acting in an investigatory capacity, "intentional[ly] mishandl[ed] and/or los[t] ... probative crime scene evidence in violation of known departmental investigative protocols." (The "probative crime scene evidence" to which Armstrong refers is the drug paraphernalia found at Kamps' apartment.) Armstrong claims that the paraphernalia evidence—which could have contained DNA evidence or perhaps fingerprints of Kamps' killer—was dumped into a garbage bag, never tested, and lost prior to Armstrong's trial in 1981; all this, Armstrong alleges, was done in bad faith in an effort to deprive him of evidence which may have demonstrated his innocence. Armstrong argues—and the majority agrees—that in 1980 and 1981 a reasonable prosecutor was aware that he or she could not, in bad faith, fail to preserve potentially exculpatory evidence. I disagree.

In assessing the applicability of qualified immunity, we determine whether an official violated clearly established law through his or her conduct. *Ashcroft v. al–Kidd,* 563 U.S. 731, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011). To determine what conduct was clearly established as unconstitutional at a particular point in time, the Supreme Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* In this case, the Supreme Court's position on the prosecutorial duty to preserve evidence was not clarified until several

years *after* 1980. As the majority notes, the cases of *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) and *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) expound significantly on this topic. In 1984, the Supreme Court stated, "We have ... never squarely addressed the government's duty to take affirmative steps to preserve evidence on behalf of criminal defendants." *Trombetta*, 467 U.S. at 486, 104 S.Ct. 2528. While the Court's decision in *Trombetta* did not draw a bright line indicating when prosecutors must preserve evidence, four years later the Court stated more explicitly, "We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58, 109 S.Ct. 333. Thus, I question whether a prosecutor's affirmative duty to preserve potentially exculpatory evidence was clearly established prior to the Supreme Court's pronouncements in 1984 and 1988.

But assuming that, as the majority contends, *Killian v. United States*, 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961), and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), clearly established well before 1980 that a prosecutor's *bad faith* failure to preserve evidence was a constitutional violation sufficient to override qualified immunity, I conclude that Armstrong has pleaded insufficient facts to support his allegation of bad faith. Armstrong alleges that someone—possibly the police, possibly Norsetter himself—placed the drug paraphernalia from the victim's apartment in a trash bag in 1980, and that by the time of Armstrong's trial in 1981, the evidence was lost. Even viewing the facts in the light most favorable to Armstrong, I believe that these allegations suggest actions akin to negligence rather than bad faith. And simply because Armstrong employs the key phrase "in bad faith," to describe these events does not, in my opinion, change the analysis. Armstrong fails to plead any facts demonstrating bad faith during the time period that the alleged evidence mishandling took place. In fact, in examining Armstrong's claim of bad faith, the majority primarily considers Norsetter's actions and statements over a quarter of a century after the prosecutor and his team allegedly failed to preserve certain drug paraphernalia evidence. I cannot conclude that examining statements and actions so far removed from the alleged unconstitutional conduct provides us with sufficient factual allegations plausibly suggesting bad faith. Nor do I believe that an appropriate remedy would be to remand and allow Armstrong to amend his complaint. Armstrong believes that the evidence which is central to his claim was placed into a garbage bag and subsequently discarded by unknown persons and at an unknown time; this reflects an information base inadequate to support a claim of bad faith, and further amendment would not cure that deficiency. Thus, it is my view that Armstrong's pleadings are insufficient to remove Norsetter's protection of qualified immunity. For these reasons, I concur in part and respectfully dissent in part.